Our first case for today is 2017-2433, McGuffin v. SSA. Mr. McGuffin, please proceed. Please proceed. May it please the Court. Your Honors, good morning. My name is Clarence Andrew McGuffin. I'm the petitioner in this case. Bruce Springsteen said in his song, Born in the USA, Went back home to the refinery. Hiron Man said, Son, if it was up to me. This harkens to William Strong's email to Paula Bosworth who told Mr. Strong the vet had to be terminated immediately while the other employee could either be kept or terminated. The questions of law that this case presents are whether MSPB appeal rights are benefits for purposes of USERRA or whether Which email is it? Because there are a lot of emails back and forth and I have them all in the appendix around page 1080. Which email is it that you think makes the strongest case for a possible USERRA violation? I think the strongest USERRA violation email, Your Honor, would be the one where Paula Bosworth I need to know what page on the appendix it's on. If it's quoted from one or purported to be quoted, that one about the vet has to be fired immediately. Is that the one you mean? And if so, which one is that? That email is at the appendix at page 247, Your Honor. 247? Yes, Your Honor. And on the opposing page, which is 241 in my paper copy of the appendix, Your Honor, at the top there's an email from December 22nd, 2010. And in that email, Paula Bosworth, having spoken with Judge McGraw, informs Mark Thompson, who is my supervisor, that we learned today from CHR, Center for Human Resources, that he is an accepted service employee with veteran's preference and he will acquire adverse action protection, which means he will have MSPB appeal rights after completing one year of current continuous service in the same or similar position. We were also informed that any action separating him from employment must be issued by the date mentioned in the email. And preceding that, Paula Bosworth, who is an attorney for human resources Just so I understand who all of the players are, who is Mr. Strong in the chain of command? So Mr. Thompson was your direct line supervisor, correct? Yes, Your Honor. So who is Mr. Strong? Mr. Strong was Mr. Thompson's boss. He was the hearing office director for the Raleigh ODAR and he was the decision maker in this matter. He was the one who signed the termination letter that Mr. Thompson had drafted that they submitted to me on February 4th of 2011. And so Paula Bosworth was an attorney in Atlanta at the headquarters of Region 4 who provides human resources advice to the managers and supervisors throughout Region 4. She worked under Deputy Regional Chief Administrative Law Judge Kathleen McGraw who explained to Paula Bosworth upon Bosworth's query about why it is that a veteran needed to be terminated in the first year rather than the second year. So what if hypothetically a supervisor decides that for a probationary employee, after nine months, the supervisor concludes that this person is just not working out and ought to be terminated. That wouldn't be an USERRA violation if that was the facts here, would it? No, Your Honor, it certainly wouldn't and I accede that fact. The issue as I view it, if I may, is that here we had two employees, one myself and the other Ms. Banks, both of whom the agency was contemplating terminating. According to Mr. Strong, we both had performance issues. That's why he sent the initial query to Paula Bosworth to elicit her professional opinion. Well, wait, I thought that the Board found, as a matter of fact, that there weren't performance issues with Ms. Banks. It was an attendance problem and I thought that they actually made a fact-finding to that extent. Am I misremembering the record? You're not misremembering the record, Judge Moore. That's absolutely at odds with the evidence of the record and even Mark Thompson's testimony. The e-mails that started this whole thing, in fact, said that there were two attorneys who they were considering, who Mr. Strong was contemplating terminating because they're not performing up to the standards that we expect and that was me and Angela Banks. If you look at Angela Banks' performance, the agency contends that the essential functions of the position, excuse me, are to write legally defensible decisions in a timely manner. Angela Banks had one case for over 93 days. She had other cases for 70 days, 60 days, 50, 40, 30, and so this essential function that they're saying But isn't it also true that there was a lot of other counter evidence in the record that showed that Ms. Banks was doing more work, more production than you or just more work in general through other metrics so that we couldn't necessarily say that the story is so compelling that Ms. Banks was as equally behind as you were on certain metrics? Well, Your Honor, I would say that she was at least equally deficient in whatever metric the agency turns to, whether it's The DWSIs, for example? Well, the DWSI, the agency elicited testimony about the DWSI from August until February when I was terminated. If you look at the whole year's DWSI performance metric, which the agency contended wasn't even a performance metric, and which Thompson and Strong and McGraw and Bosworth and Norton over hours and hours of deposition testimony insisted was not a performance metric. It was just a tool for assigning cases. But if you look at that and assume that it is a performance metric, and you look at Angela Banks, you find that in 5 out of 10 months, she didn't meet the 100% that the agency contends was so essential to measuring performance. So the agency wants us to look at their DWSI from August until February. It wants to look at mine for the entire 12 months, even though the agency dragged its heels to provide me an accommodation until August. Most of your argument thus far has focused on whether there's a USERA violation. If I understand the law correctly in this space, even if there's a USERA violation, if the agency establishes they would have taken the same action, regardless of the prior military service, then that action is okay, right? There isn't a problem. Absolutely. And I would accede that fact, Your Honor. It's not a fact. It's a statement of law. But on page 20 of the appendix, the board credits Mr. Strong's testimony, which it expressly finds credible, that he would have taken the same action against a non-veteran who was performing similarly to the appellant after nearly a year on the job. So what do we do with that? That is a fact finding by the board based on testimony that it expressly finds to be credible, where he claims that basically anybody who was underperforming at the level that he represents that you were underperforming at, that he would have fired any person, whether they had one year, two years, or 10 years of probationary period, he would have fired them at that point in time. It's quite an assertion, and the Hillen is very clear on what the judge needs to do in order to make credibility determinations. In this matter, what she did was say, well, they all seem to be saying the same thing at this hearing, but she never really looked to see whether or not what they said was consistent with... What would have happened had you made it into the two-year period, past that one year? Now you're in the two-year period. Would you have received additional training, or would there be an extended period at which you could try to come within the acceptable metrics? After the one-year mark, in other words, the next day, I would have fallen under the performance metric that would have actually looked at whether or not I was performing my work in a timely manner, i.e. under the seven-day benchmark. It would have started looking to see if I had been performing my fair share of the work. But before that one year, none of that applied, and so at the end of the hearing testimony, Judge, the AJ, I was trying to elicit testimony about what would have happened there, and she acknowledged that the next day I would have been under a full performance plan, and all of the protections of an opportunity to perform successfully, notice, and the ability to work under that for six to eight months before the agency could assess and say, well, you're not meeting this standard. What the agency wanted to do here was look at my performance from the day that I was hired, and then based upon that, before they sent me to training, before they provided an accommodation, say, well, you know he's not performing fair share. The emails over and over and over again, I feel like Marco Rubio, my mouth is so dry. The emails over and over and over again show that they're applying this inapplicable standard to me, and Bosworth repeatedly told Thompson and Strong that fair share in the DWSI absolutely did not apply to me. Judge McGraw was CC'd in every one of these emails, and she never told Bosworth, that's not correct what you're telling Thompson and Strong. And so what you have is Thompson and Strong and Dodds, who's the one who has the draft decision at the beginning of the appendix for the respondent, conspire. They actually discuss changing their rationale to say that I'm not engaging in learning, so that they can misapply the DWSI in fair share. Well, let's just take this from a pragmatic point of view. I think whenever an employee is in, or someone that's been hired is in their probationary period, the federal manager is trying to assess can this person, once they're on a full performance plan, perform the work successfully under the performance plan. And here, if the federal managers were seeing that you were not making the numbers, then they needed to try to project out, well, would you ever get there once you reached full employee status? And if they lost confidence that you would be able to perform under that performance plan, then isn't there a problem and a basis for saying, okay, then this isn't the kind of person that we want to keep on the team. Your Honor, I'm in my rebuttal time. Do you mind if I go ahead with my answer? Well, the problem with that presumption is that when we look at all the other employees in Raleigh-Odar, and when we look at all the other employees throughout Region 4, these metrics that they were applying to me, apparently they weren't applying them to other writers, because you have DWSI numbers that are in the teens, the 20s, the 30s. Throughout the five years that I was able to obtain the data in FOIA, you have people that are 50 days, 70 days, 80 days into the seven-day benchmark, and yet Strong and Thompson admitted in deposition they're not even sending them emails. So these metrics that they're saying are so important and that they're roughly applying to me, assuming what Your Honor says is true, well, that's fine. We should project and see if an employee is going to work out, but to apply a different metric to me than what would be applied to all the other employees, to me it seems not relevant to that determination of whether I'm going to work out in the long run, particularly when my numbers are on the upswing, and I was writing good decisions, and I deserve the balance of my time. Okay. Thank you. We'll hear from the government. We'll save the remainder of your time for rebuttal. Thank you, Your Honor. Why was it so important for the agency to remove him within one year? Well, I think the agency, as with any employee, when an employee is coming towards the end of their probationary period, will look at how that employee is performing. Of course, the agency was looking at multiple employees at that time, as Mr. McGuffin mentioned. But there's clearly a focus here to remove this employee within one year. And why is that? Why couldn't you have waited a week? Well, Your Honor, the nature of the probationary period is such that it is a period in which the employee is still being scrutinized much more carefully because greater rights attach at the end of that period. Yeah, and I understand that, and I thought maybe that'd be your answer, and I just wanted to clarify that because it seems to me that your answer is because he's a veteran. And because he's a veteran, he has this one-year period, and if we don't fire him before the end of that one-year period, then he'll have additional benefits, or rather it'll be a bigger burden on the agency to keep him beyond that one year. Why isn't that a focus and a decision to terminate on the basis of his veteran status? Well, Your Honor, just in terms of one element of the record, I would like to point out that the agency was thinking about another employee at that same time as well and considering her work, even though she had a longer probationary period. However, that gets to Mr. McLaughlin's broadest argument. But that's exactly the reason the agency decided to put things on hold with Ms. Banks is because she had a longer probationary period. I mean, the e-mails say we have two employees who are not working out. That's what the e-mail at 225 says, they're not working out. At 226, it says neither of them is performing up to the standards we expect. But then suddenly there's an e-mail that says the vet has to be terminated in his first year. For the other, it's two years. Don't forget we need time to get these cleared through HQ. And then all of the e-mails started focusing on the vet and the vet vet vet because you had two years for the other employee. So you could play out a PAC or a performance improvement plan. I mean, they have all about five different acronyms for what I felt to a performance improvement plan in my mind. So just assume that whatever acronyms you're using, I'm calling it a performance improvement plan. But you could allow that to play itself out over a reasonable period of time for the other employee because she had two years. But because this guy was a vet, suddenly everything stopped with regard to Ms. Banks. And there are a gazillion e-mails, we've got to get rid of the vet right away. How does that not amount to a USARA violation? Well, Your Honor, it comes down to the issue of whether a shorter probationary period is a USARA violation. And as we've argued, it shouldn't be because USARA was enacted after the. It's the differing treatment that you applied to Ms. Banks and to Mr. McGuffin. They were both the e-mails lumped the two of them together initially in all respects. The first e-mail was we have two people that are not working out. What do we do? The next e-mail was neither of them is performing up to the standards we expect. Then when you're told one's a vet, we stopped paying attention to Mrs. Banks' underperformance, whatever that may or may not be. And we started focusing exclusively on the vet. Well, I think there are two parts to that. One is that the record shows that there was substantial evidence that Ms. Banks didn't really have the sort of problem that Mr. McGuffin was having with performance. There was testimony that the concern that they had had about her related to the way that she was making requests for leave with her supervisor. And there was basically an interpersonal issue going on. And that once they counseled her, that was quickly resolved. In addition, the evidence shows that she was performing much, much better along a couple of measures that are discussed in the record, ways that the agency kept track. Did the record also show that Mr. McGuff improved his performance when he was put into this training program before the termination happened? It did. He actually improved, didn't he? He did improve. He did not reach the level at which Ms. Banks was performing at that time or the other attorney that was hired around the same time. But he wasn't an upward trend. So he was improving. It was an upward trend, yes, during that interval. So when we look at this e-mail, and this is the October 25th e-mail from Kathleen McGraw, it says, The veteran has to be terminated in his first year. And then it goes on for the other two years. Don't forget, we also need to get clear. The veteran has to be terminated in his first year. It seems to me that these e-mails march on to where the termination decision changes from let's terminate him because he's underperforming to let's terminate him now because if he gets beyond another year, we, the agency, are going to have a greater administrative burden. And that is veteran focus, and that's a use of a violation, isn't it? Well, no, Your Honor. As we've argued, you know, what the agency, first of all, what the agency is doing there is just looking at what the probationary period is. In those e-mails where it's talking about his veteran status is because it's connected to the probationary period. Let me ask, why does it matter? Why does it matter whether he's got one year or the two years? Well, why does it matter? I mean, it's something that when individuals in the federal service are having performance issues, and their supervisors talk to HR and say we're concerned that this person is having a performance issue, that's the kind of information that HR will give them in terms of what. People with performing issues get fired in their second year, third year, 25 years later. I mean, we get those cases. People with poor performance get fired at all the different stages that exist at the agency. But the focus here was to fire this veteran within one year precisely because he was a veteran. Well, Your Honor, there are e-mails that show that the agency was cognizant of the performance period, but it is not, it's not, it doesn't show animus towards veterans to be aware of what the performance period is, and that the performance, the shorter probationary period is permitted by USERRA. USERRA was enacted when that probationary period was in place. And so if it had intended to... That's a benefit for the veteran. And during that one year, that's a benefit for the veteran. The veteran can also appeal to the board. But if the veteran goes into the second year, then the veteran acquires additional rights, additional benefits. And it's those benefits that it seems to me the agency is trying to avoid. Because if you fire him later, then your burden is greater. It would be a bigger problem on the agency to fire him then. At that point, it seems to me that the decision of fire is focused on his veteran status. Well, the decision, the managers were considering what the probationary periods were because that's something you do if you're having performance problems with... Let me ask you this question. So there's two comparators that were raised, correct? Two other individuals. Well, there were Mr. Von Oyen... I'm sorry, Mr. Von Oyen and Ms. Cade. There were two people in another office that were also fired, but there were also two people in his own office that were retained. So I'm not sure which one the court is... Well, the ones that were fired. The ones that were fired, yes. And they were put forward as evidence that Mr. McGowan would have been fired regardless of his veteran status. There's two other people that we fired close to the same period of time and for that same reason. That's correct, Your Honor. Neither of those individuals are veterans, correct? That's right, Your Honor. And both of those individuals, one was fired in the 15-month period and the other in the 13-month period. That's exactly right, Your Honor. You all didn't come up with firing a veteran within that one-year period, did you? I'm sorry? There was no comparator that was offered that had been fired within that one-year period. Well, not exactly within the one-year period, but there were several. I mean, we do see in the record several non-veterans being looked at at that period and that those two individuals were fired shortly after the one-year period, that they considered whether Ms. Banks was having issues around the time Mr. McGuffin, they were considering Mr. McGuffin's performance in his own office, and then they considered those other two in another office at a slightly later point. I have two concerns about this. My first concern, which I'd like your thoughts on, seems to me that training period, PIP, whatever, I'll stick with PIP. The PIP period seems entirely pro forma based on the e-mails. The e-mails are, well, we've got to hurry up and fire him, we've got to hurry up, we've got to leave time for HQ. First, there's talk about putting him on PACs or these longer performance plans that would give him a chance to demonstrate that he's meeting the standards, and then it was suddenly reduced to, well, just give him two weeks because we've got to hurry this up. Well, just give him two weeks doesn't sound like there is any legitimate desire behind it to see him improve, help him improve, recognize his improvement. These e-mails read like that training program was entirely pro forma, that's the way they read. And then when you combine that with the fact that the standard is, is he demonstrating the capacity to learn, and when during that three-week training period, it was supposed to be four weeks, but by the way, they already wrote the notice of removal at the three-week period, so they were winding their ducks up before the four-week period even expired because four weeks was the D-day, right? So three weeks into the period, he was operating at 80%. His prior statistics had been 62, 37, 44, 13, 36, 40, 55, 63, and 46. So during the training period when he was getting this more personalized service, which is the whole point of a PIP, to put someone on a program and help see if they're capable of improving, he improved dramatically. His highest achievement number prior to that in any month had been 63%, and during the PIP, the training program, he achieved 80%. And if the standard is capable of learning, why doesn't, I don't understand. I'm confused. Well, Your Honor, I mean, the issue here is really whether, whether the agency would have fired somebody who only managed to get to 80%. Can you see why, in my view? Well, first of all, he managed to get to 80% at the three-week mark because they already drafted the notice of removal. They didn't even wait out the entire four-week PIP period. They made their decision three weeks into it. Well, I don't think that early drafting to prepare for a possibility necessarily shows that the decision was made. Also, if you look— You don't think these emails showed the decision was made? Don't you remember the emails that said, don't issue the notice yet, we still have to have approval from Falls Church? There were three emails because Mr. Thompson was chomping at the bit to issue the notice of removal, and he kept having to be put on hold. Don't issue it yet. We've got to get approval. We've got to get approval. You don't think those emails indicate the decision was made in advance of the end of the PIP period? Well, the record certainly shows that there were mixed feelings, but overall a desire to give Mr. McGuffin a chance. That's what I don't see. I don't see any evidence in this record of a desire to give Mr. McGuffin a chance. Show me any email that shows anything that shows a desire to give Mr. McGuffin a chance. Well, if you look back at his initial performance evaluation, it says his work is really not acceptable, how much work he's doing. But they bring him successful, and they start making inquiries, and they let him keep his mentor. Stop, stop, stop. Let me talk, please. I agree with you that his performance could be viewed as completely unacceptable, and I don't have a problem with his supervisors having thought that when they said, we've got two people that aren't meeting the standards that we expect. The problem is with how it got handled from that point forward. It doesn't seem to me that there was any legitimate opportunity for him to demonstrate he was capable of meeting the learning standard thereafter. It seems like the decision was made, and it wasn't made from his banks or other people because there was a longer runway on those employments. And that's the problem. This looks an awful lot like you decided to hurry up, fire a veteran, not actually give them a true PIP based on the emails because he was a veteran and had a one-year period, and you didn't want additional rights to attach, so we're not even going to give him a chance to actually demonstrate he's capable of learning. Well, and to be clear, a PIP wasn't required, so the fact that the agency decided to use a PIP alone shows that the agency was, you know, at least trying to give him an opportunity. In addition, during that period between when the record shows that there were concerns at the time of his performance evaluation based on the comments in that evaluation, he was allowed to continue working with a mentor. The agency tried to, you know, manage his assignments differently. Instead of just giving him all kinds of assignments in a lump, you know, they would try to basically organize him like this is what you do today and then tell us at the end of the day if you're having trouble. I mean, at that point I believe that was on the PIP. But he kept his mentor in the office much longer than the other new hires, Ms. Banks and Ms. Brewer, and that was actually one of the agency's concerns is that he wasn't progressing towards independent work, which is one of the things that he was supposed to be showing he was progressing towards. There's testimony for that by Mr. Thompson. I know your time is up. Can I ask one more question and then I think Judge Rayna might have one because he's looking like he wants to ask another question. My last question for you is did the agency, in deciding to terminate this individual, apply the right standard that should be applied to him? Namely, it seems to me the right standard, and correct me if I'm wrong, should be a learning standard as opposed to a fair share standard because all of the documents were generated originally with regard to removal according to a fair share standard, which if I understand it right, is the standard that would normally apply at the end of the two-year period, that there is a training period, you know, one year, two years, right, and that there's a higher standard that you apply to an employee at the end of the two-year period to assess whether they're capable of doing their job than the standard you would apply at the end of a one-year period. Am I right about this? Yes, Your Honor. I think there was some confused use of that terminology in his performance evaluation, and then there was later testimony in the record where the manager, and I think it was Mr. Thompson, although it could be Mr. Strong, explained that he meant, you know, progressing towards that goal of being able to handle your fair share and that Mr. McGuffin was not progressing towards being able to handle his fair share and that he was not working independently and that that was the concern, you know, although he did use the wrong terminology at one point. And does the evidence bear out that? Do you think there's substantial evidence for that, given, like I quoted you all the percentages during the training period, he clearly had a pretty substantial increase in productivity? Do you think that the record bears out or provides substantial evidence for a fact finding that despite that he still wasn't demonstrating that he was working towards that? You know, I think the agency, yes, I think the agency still had concerns. He still, at his best, was performing well below the other attorneys he had hired at the same time. But wouldn't they have, if he had a two-year period, wouldn't they have put him on a little longer of a runway, like they did with Ms. Banks or other employees? I don't know, Your Honor. I mean, they didn't do that with Ms. Banks. In addition, you know, as I think the court mentioned earlier, you know, the administrative judge made credibility determinations and fact findings that the agency would have treated a non-veteran in the same manner under the circumstances. And Mr. McGuffin has not come up with any sort of evidence to overcome, you know, this sort of credibility determination. Except that none of the e-mails actually support that testimony at all. And, in fact, all of the e-mails directly contradict it. I mean, this is the worst e-mail I've ever seen. We've got to fire the vet within a year. Can you explain the story of why, you know, beyond the credibility determinations that you're pointing to, that there's actually record evidence to support the idea that this particular employee was going to be terminated anyway within a 12-month period? What's that story? Well, I mean, if you look at the record, you know, there's both, you know, more quantitative information that the agency kept track of about decision writers and there's more qualitative reports that you see in the record. In terms of quantitative information, you know, Mr. McGuffin was writing less than half of the decisions that Ms. Banks and Ms. Brewer were writing in the same period of time. In addition, there's this DWSI index, which kind of incorporates certain assumptions about how much work attorneys or attorney advisors or decision writers could do in a certain amount of time. And in terms of that measure, you know, he was completing, you know, kind of about half of his work for most of the year. In addition, there were more qualitative reports. His supervisors testified about having spoken to administrative judges who were concerned about the quality of his work. And so all of this indicates that the agency had real performance concerns. There's not evidence that shows that the other individuals that were hired at the same time had those concerns. And, you know, that explains their different treatment. Okay.  Thank you, Your Honor. Mr. McGuffin, you know, we'll restore your three minutes of rebuttal time because we went over with the government. But just because we restore it doesn't mean you have to use all of it. Thank you, Your Honor. First, I want to address your decision, Your Honor, in Lau in which, or it wasn't your decision, but you were on the panel of judges in Lau that recognized that MSPB appeal rights are a benefit that have been granted to veterans and that have been withheld from non-preference eligibles. If you look at the appendix, there's the agency's own personnel policy manual which clearly refutes this notion that I was in a one-year trial period. The MSPB, when it remanded this case back to the AJ, had already determined that I was serving under a two-year trial period. The only difference was that after one year I would obtain these benefits. If you take counsel, or excuse me, if you take respondent at its word that I was a poor performer who should have been terminated... Can you help me try to figure out what could be the legal test for a NUSERA violation for a veteran who's in a probationary period of one year before they get these statutory rights, appeal rights? If a federal manager had just decided, after six, seven, eight, nine months, this person is not working out and needs to go  that certainly isn't a NUSERA violation, right? No, Your Honor. Now, what if there are e-mails that say, yes, where one federal manager tells another, yes, you can go ahead and terminate the person if you want, you think you will, but just to let you know, the one-year anniversary for this person is in two months. And just to let you know, at the one-year anniversary, if you choose to try to terminate someone at that time, then all these appeal rights and protections kick in. And so it will be a much more arduous process for you as a federal manager to terminate that person at that point in time. Under that fact pattern, would that be a NUSERA violation? I'm not the judge, but I would suggest that it's not. I would suggest that it's not and concede that. But here, what we have is two people who are explicitly being compared. And so had the agency terminated... Right, then I'm just going to take the comparator away for the moment. Let's assume for the moment that Banks is not a comparator or we assume that the Banks issue got resolved inside of one year. So whatever the issue was with Banks that the manager expressed in October had been resolved before the one-year anniversary. So I think, Your Honor, that what it would boil down to is whether or not the intention, and that's a factual question, whether the intention was to deny the veteran a benefit of employment based on his veteran status. So if you're solely looking at this from the perspective of am I going to have to do more paperwork to get rid of this poor performer, then I wouldn't see how that would be a NUSERA violation. But when you take what happened here and you have people contemplating what's easily acknowledged as an employment for a veteran and then upon that acknowledgement proceeding to terminate because of that, then you have a problem. Like had they fired both of us, everything would be fine. If I can turn briefly to a timeliness issue that Judge Moore, you raised, Mark Thompson admitted in deposition that he had already decided to terminate me by December 18th. It's in his deposition at page 185, which is in the appendix, but I didn't think I'd need that. The weekend before Christmas, this guy was a family man, on a Saturday, sent an email to Paula Bosworth with a draft termination letter. So why isn't that evidence that they would have terminated you anyway, regardless of whether you were a veteran, because by month 10 they already decided, your manager decided that you weren't working out? Because at that point Paula Bosworth and Judge McGraw had already telegraphed to them that they needed to get a move on on this and at that point Mr. Strong said, listen, we need to couch this in terms of engaging and learning, go poll some judges, including one who was in on the emails, Judge Dodds, and say that he's not engaging in learning so we can terminate him. Mark, you go ahead and start working the draft. And so, again, the timeliness and pretext issue, both of those decisions, the Judge Hall and the Judge Dodds decision, were after December 18th. One, Judge Hall's email, was on January 26th, when they're already sending drafts down for review. Okay, Mr. McLaughlin, we are well beyond our extra time, so I thank both counsel for their argument. The case will be taken under submission.